## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

JOSEPH MCCARTHY                    PLAINTIFF

VERSUS          NO. 4:13CV85-DPJ-FKB

SHERIFF TOMMY WADDELL, INDIVIDUALLY    DEFENDANTS
AND IN HIS OFFICIAL CAPACITY AS
SHERIFF OF NESHOBA COUNTY, MISSISSIPPI;
AND JOHN DOES 1-100

*****************************************************
**DEPOSITION OF SHERIFF TOMMY WADDELL**
*****************************************************

Deposition Taken at the Instance of Plaintiff
In the Offices of Jordan & White
Philadelphia, Mississippi
On November 13th, 2013
Commencing at 10:16 a.m.

REPORTED BY: CARRIE L. BENOIST
Certified Shorthand Reporter
CCR #1744

_____

BOND & BENOIST
Post Office Box 1576
Madison, Mississippi 39130
bondreporters@gmail.com

## Page 2

APPEARANCES:

CHARLES R. MULLINS, ESQUIRE
Coxwell & Associates
Post Office Box 500
Jackson, Mississippi 39215

REPRESENTING PLAINTIFF

ROY A. SMITH, ESQUIRE
STEVEN J. GRIFFIN, ESQUIRE
Daniel, Coker, Horton & Bell
Post Office Box 1084
Jackson, Mississippi 39215

REPRESENTING DEFENDANTS

ALSO PRESENT: WADE WHITE, ESQUIRE

## Page 3

Table of Contents:

Style.................................................... 1
Appearances....................................... 2
Table of Contents............................... 3
Examination by Mr. Mullins...................... 4
Exhibit 1 marked.............................. 10
Exhibit 2 marked.............................. 10
Exhibit 3 marked.............................. 19
Exhibit 4 marked.............................. 20
Exhibit 5 marked.............................. 27
Exhibit 6 marked.............................. 33
Exhibit 7 marked.............................. 56
Exhibit 8 marked.............................. 56
Exhibit 9 marked.............................. 56
Exhibit 10 marked............................. 63
Exhibit 11 marked............................. 63
Exhibit 12 marked............................. 69
Examination by Mr. Smith......................... 82
Further Examination by Mr. Mullins............... 87
Certificate of Reporter......................... 93

## Page 4

**SHERIFF TOMMY WADDELL,**
**having first been duly sworn, testified as follows:**
**EXAMINATION**

BY MR. MULLINS:

Q    Sheriff?

A    Yes, sir.

Q    How are you?

A    I'm doing good.

Q    Chuck Mullins. We have met several times in the past.

A    Yes, sir, in the courtroom.

Q    Yes, sir. This is a deposition, so I have got to ask you formal questions, such as, can you tell us who you are for the record?

A    My name is Tommy Waddell. I'm the sheriff for Neshoba County.

Q    Okay. When were you elected?

A    I was elected in the year of 2011, took office in the year 2012.

Q    What's your date of birth?

A    6/12 of 1964.

Q    That would make you 49?

A    Forty-nine.

Q    All right. Where were you born?

A    I was born here in Neshoba County.

EXHIBIT "B"

1  Q   All right.  And lived here all your life?
2  A   Yes.
3  Q   Married?
4  A   Yes.
5  Q   Kids?
6  A   Two stepchildren.
7      MR. GRIFFIN:   Chuck, you're asking a lot of
8  background questions, and this is a deposition that's
9  limited just to qualified immunity issues.  And that's
10 fine.  I just want to make sure that's on the record.
11 That's what the deposition is limited in context to.
12     MR. MULLINS:   You don't want me to ask who
13 he is?
14     MR. GRIFFIN:   No, that's fine.  I just want
15 to make sure that's on the record.
16 BY MR. MULLINS:
17 Q   All right.  Two stepkids?
18 A   Correct.
19 Q   Are they adult kids?
20 A   One is 17, the other is 20.
21 Q   All right.  Did you graduate?
22 A   I did.
23 Q   Philadelphia High School?
24 A   Neshoba Central.
25 Q   Neshoba Central.  1982?

1  A   '82, that's correct.
2  Q   You know how I know?  Because I graduated in
3  '86.
4  A   Okay.
5  Q   Tell me about your police experience.
6  A   I began my career in law enforcement at the
7  age of 21.  I was hired by the Philadelphia Police
8  Department, went to work there July the 9th of 1985 as
9  a patrolman.
10 Q   How long were you with the Philadelphia
11 Police Department?
12 A   I worked there for a total of fourteen
13 years.  I was promoted through the ranks as a
14 patrolman.  I don't know the years, but I was promoted
15 to investigator and then later chief investigator
16 until 1999.  January the -- at the end of January, I
17 left the Philadelphia Police Department.  I left to
18 take a job with the Mississippi Department of
19 Wildlife, Fisheries and Parks as an officer,
20 conservation officer stationed here in Neshoba County.
21 And I worked -- I worked almost twelve years until I
22 resigned to run for public office.  Under state law,
23 to run for any public office, I had to resign.  Then I
24 was elected sheriff.
25 Q   So from '85 to the present time, you have

1  been in law enforcement either through the
2  Philadelphia Police Department or the Mississippi
3  Department of Wildlife or the sheriff?
4  A   That's correct, expect the almost -- well,
5  right at almost a year while I was running my
6  campaign.
7  Q   I've got you.  And you went through the
8  academy, I'm sure?
9  A   Correct, in 1986.
10 Q   Okay.  Certified police officer in the state
11 of Mississippi?
12 A   Correct.
13 Q   Let me jump to some things in this case.
14 You were carrying a Glock 23 --
15 A   Correct.
16 Q   -- on the night that this all happened.
17 Correct?
18 A   Yes.
19 Q   Were you certified to handle that service
20 revolver?
21 A   I had been certified on the Glock.  Not that
22 particular Glock.  I was certified -- that's actually
23 what I carried when I was with the game and fish
24 commission was the Glock.
25 Q   All right.  Let's back up.  Which Glock were

1  you certified on at the time that Joseph McCarthy was
2  shot?
3  A   Okay.  At that time, I was carrying a Glock
4  23.
5  Q   Okay.  Which one were you certified on?
6  A   What I took as my duty weapon when I was
7  with the game and fish was the Glock 22, which it all
8  functions identical, you know, the same way.
9  Q   Okay.  Let me show you a picture of a --
10 what appears to be a Glock and see if you can
11 recognize that.
12 A   It appears to be.  It appears to be my
13 sidearm.  To say for sure, I would have to check the
14 serial number, but it appears to be.
15 Q   That will be a better picture right there.
16 I know you may not --
17 A   Yes, it appears to be.  That's the same
18 model and manufacturer as the one I carry.  It appears
19 to be.
20 Q   Okay.  This is a Glock 23?
21 A   Correct.
22 Q   And it may not mean anything.  I don't know.
23 A   Yes, sir.
24 Q   But at the time, were you certified to carry
25 a Glock 23?

1     A     At the time of the incident, this gun here
2 was just issued to me by the county. I had taken
3 this -- I had taken this gun and I had fired it, but I
4 had not been to the firing range just to be familiar
5 with -- to be familiar with it.
6     Q     What do they do? How do you get certified?
7 And Neshoba County has policies and procedures about
8 certification on firearms?
9     A     Yes, sir, we go to the firing range.
10     Q     What do you have to do at the firing range?
11     A     Just go to the range and go through an
12 exercise of firing that weapon and qualifying.
13     Q     Okay. And so you had done it on the --
14     A     22.
15     Q     Okay. The 22?
16     A     Correct.
17     Q     When was the last time you were certified on
18 the Glock 22?
19     A     It was while I was with the game and fish
20 commission. I don't know the exact date.
21     Q     All right. Correct me if I'm wrong. You
22 left there, the game and fish, in 2009 or '10?
23     A     It would have been, no, 2011.
24     Q     And you took the year off to campaign?
25     A     Actually -- actually, I left the game and

1 fish was the last day of January. The first day of
2 February is when I began my campaign, and I campaigned
3 through that year. That same summer I was elected,
4 and then I took office that following January.
5     Q     So that would have been January 2011 is when
6 you quit the wildlife?
7     A     Correct.
8     Q     You would have been certified under the
9 Glock 22 obviously sometime prior to January 2011?
10     A     Yes, sir.
11     Q     Do you remember?
12     A     I don't know the date.
13     Q     Fair enough.
14     MR. MULLINS:    Let's get these two marked as
15 Exhibits 1 and 2.
16     (Exhibits 1 & 2 were marked for
17     identification and are attached hereto.)
18 BY MR. MULLINS:
19     Q     Have you since been certified on the Glock
20 23, Sheriff?
21     A     I have.
22     Q     And when did you get that certification?
23     A     I don't know. I would have to go back
24 through my files, but I have been certified on it,
25 went to the range.

1     Q     Under the policies and procedures that I
2 have from Neshoba County, your deputies are required
3 to get certified once every 12 months. Correct?
4     A     Correct.
5     Q     Do you know of any differences between the
6 Glock 23 and the Glock 22?
7     A     Meaning like?
8     Q     Trigger pull, anything?
9     A     No, sir, not that I know of. They all
10 function pretty much, you know, function the same way.
11     Q     What is the trigger pull on that Glock 23
12 you were carrying, if you know?
13     A     I don't know. I would assume -- I don't
14 know.
15     Q     Would you have any disagreement if I
16 suggested to you it was five and a half pounds?
17     A     I wouldn't disagree with you.
18     Q     But you don't know that for a fact?
19     A     No, sir.
20     Q     When you went through your certifications,
21 do trainers cover things like that with you?
22     A     I don't recall of any -- I don't know of any
23 training where I have been told what the trigger pull
24 was, no, sir.
25     Q     How would you -- you've fired weapons --

1     A     Yes, sir.
2     Q     -- a lot more than me over the years.
3     A     I don't know.
4     Q     Well, trust me.
5     How would you describe the trigger pull on
6 the Glock 23 compared to other firearms you have fired
7 other the years.
8     MR. SMITH:    Object to the form of the
9 question. That calls for speculation.
10 BY MR. MULLINS:
11     Q     Can you answer it?
12     MR. SMITH:    You can answer if you know the
13 answer. He didn't say what other guns.
14     A     Well, it depends.
15     MR. SMITH:    That's a very broad question.
16 BY MR. MULLINS:
17     Q     Compared to the 22, the Glock 22, how was
18 the trigger pull?
19     A     Basically, I couldn't tell any difference.
20     Q     Okay. What other service revolvers other
21 than the Glock 23 and Glock 22 have you had over the
22 years?
23     A     Many different ones.
24     Q     38?
25     A     No, sir. 357.

Q   How would it compare to the 357 trigger pull?

A   The 357, to me, has got a harder trigger pull because of the action.

Q   Meaning?

A   Which the 357 that I had at the police department was a revolver which means the chamber, you have to pull -- it's a harder trigger pull than the semiautomatic.

Q   Because you have to actually pull the trigger to rotate?

A   And it rotates the cylinder.

Q   On the night when this happened was February 21st, 2012.  Is that correct?

A   Yeah.

Q   I'll let you review anything you need to see.  This is the report to refresh your memory.

A   Yes.

Q   Did you or any of your deputies have audio or video of any of the events that took place?

A   They would be -- they would be recordings through 911, the radio traffic.  That would be the only video that I'm ware of.

Q   And that would be audio?

A   Yes, audio.  Yes.

Q   Do your car or your deputy's cars have video cameras set up in them?

A   We do.  We do have one camera system in the DUI unit that's used for DUI enforcement, but I don't recall if that unit was involved or not.

Q   Who would normally back then have -- who was your DUI officer?

A   His name is Jonathan Spears.

Q   Deputy Spears was involved in the pursuit that night.  Correct?

A   Correct.

Q   Do you know if he would have had his video running?

A   I'm not aware.  I don't know, sir.

Q   Is it like any other video in police cars that comes on as soon as lights are activated?

A   Not to my knowledge, it doesn't.

Q   How is it activated?

A   I'm not sure.

Q   Have you seen any video?

A   No, sir, I have not.

Q   Did the MBN officers that investigated this case, did they go to check Deputy Spears' vehicle?

A   I'm not for sure, because when the incident occurred, you know, by my orders I summonsed the

Mississippi Bureau Investigations.  From that point, I had no involvement in the investigation.

Q   You recused yourself, for lack of a better word?

A   Correct.  I sure did.

Q   But to your knowledge, you don't know if they saw a video?

A   No, sir, not to my knowledge.

MR. WHITE:   Mr. Mullins, if I could interject, and it's not in an effort to push somebody to testify one way or another, but Jonathan Spears wasn't a DUI officer at that time.  There was a -- I think Josh Burt was the DUI officer.  Just to help you in your investigation, if you're going to look into Jonathan's car, if we had a camera and it would be in the DUI car, he wasn't the DUI officer then.

A   That's correct.  He is exactly right.  Josh Burt was.  Josh decided he wanted to give it up.  I don't know the date, but that is correct.

MR. MULLINS:   And Wade, who are you representing here today?

MR. WHITE:   The county.

MR. MULLINS:   Okay.  Have you entered an appearance?

MR. SMITH:   And let him finish his question

before you answer, because I may want to object.  He is talking real fast and asking questions real fast. You just let him finish before you answer.

BY MR. MULLINS:

Q   I usually do cover that, but since you have been a police officer so long, for her benefit, you and I don't need to be talking over each other.  I know we do that in conversation all the time, and I'm the world's worst, but if you'll let me finish the question, I promise I'll let you finish the answer.

Roy is absolutely right.  He may want to object to something, so give him time to interject and he if he has something to object to.  If you have any questions, if I don't ask something right, you have three lawyers here you can ask or you can just ask me to rephrase it.  You know how to do that.

A   Yes, sir.

Q   I'm going to presume you understood my question if you answer it.  Okay?  Is that fair enough?

A   Yes, sir.

MR. MULLINS:   Wade, I'm sorry, you're representing the county?

MR. WHITE:   I'm the board attorney.  If you need me to, I'll go file an entry.

1    MR. MULLINS:   No, no, no, I'm just making
2  sure --
3          MR. WHITE:   I'm just kind of trying to help
4  out, and I apologize.
5          MR. MULLINS:   No, that's fine.  Look, I may
6  have missed something on the ECF filing, so I just
7  wanted to make sure I had all my parties straight.
8          MR. SMITH:   He has not entered an appearance
9  and probably won't, but he is here as the board
10 attorney.
11         MR. MULLINS:   Excellent.  Wonderful.
12 BY MR. MULLINS:
13     Q    So to clarify, Wade was correct that Deputy
14 Spears was not the DUI officer at the time?
15     A    Correct.
16     Q    You were not in any car that night that was
17 equipped with a video camera?
18     A    Not to my knowledge.
19     Q    Nobody had audio recordings on their
20 uniforms that night that you know of, other than the
21 911 calls?
22     A    No, sir.
23     Q    What is your radio calling?
24     A    Mine?
25     Q    Yes, sir.

1    A    Neshoba 1.
2    Q    Was it N1 at the time?
3    A    Yes.
4    Q    Let me -- Sheriff, I have handed you a
5  document which purports to be the 911 dispatch
6  printout from the night all this occurred.  Have you
7  seen that before?
8    A    No, sir, I have not.
9    Q    Take a minute and see if you can look
10 through that and see if it's what I purported it to
11 be.
12         MR. SMITH:   And take your time.  You don't
13 have to rush.
14         THE WITNESS:   Yes, sir.
15     A    It appears to be, yes.
16 BY MR. MULLINS:
17     Q    And what time does it appear to be that this
18 call was initiated to the Neshoba County Sheriff's
19 Department?
20         MR. SMITH:   The call from who?
21         MR. MULLINS:   The call from Ms. Sanders
22 reporting her car stolen.
23 BY MR. MULLINS:
24     Q    Or you can tell me if you remember.
25     A    The only thing that I recall is

1  approximately the time that I was notified at home.
2    Q    What time would that have been, Sheriff?
3    A    Probably 10:30, 10:35 at night, p.m.
4    Q    Now, if you flip back to the very first page
5  of that -- let's go ahead and get that marked as
6  Exhibit 3 so when he references it it will be clear on
7  the record.
8          (Exhibit 3 was marked for identification and
9                is attached hereto.)
10 BY MR. MULLINS:
11     Q    Would I be correct that the very first entry
12 there would be the first call?
13         MR. SMITH:   Object to the form in case he
14 doesn't know.
15         MR. MULLINS:   Sure.
16     A    I don't know.  I was at home when the
17 initial call came in.
18 BY MR. MULLINS:
19     Q    Well, I mean, are you familiar with your 911
20 printouts and how your 911 --
21     A    Somewhat.
22     Q    Okay.  To me, it appears that this document
23 on February 22nd, 2012, at 22:24, which is 10:24 and
24 29 seconds, there's a first entry of a call.
25     A    What time did you say?

1    Q    The first entry there, 10:24.  It says
2  22:24.
3    A    I see a call that came in at 22:24.
4    Q    Based on your understanding of how the 911
5  system works, would that be the first call that was
6  made?
7    A    I'm not seeing a name on the first call at
8  22:24.
9    Q    Okay.
10     A    I'm not for sure.
11     Q    Okay.  But regardless, according to your
12 statement --
13         MR. MULLINS:   And let's get this marked.
14         (Exhibit 4 was marked for identification and
15                is attached hereto.)
16 BY MR. MULLINS:
17     Q    First, can you recognize this marked Exhibit
18 4?
19     A    I can.
20     Q    What is that?
21     A    It is a typed statement that was taken by
22 the investigator with the highway patrol.
23     Q    The date on that statement is when?
24     A    2/21 -- 2/22.
25     Q    So that's the next day?

1    A    Yes.
2    Q    Okay. And it doesn't have a time, but I'm
3  assuming it was sometime on February 22nd, 2012, that
4  you typed out a statement?
5    A    Well, I furnished them the information.
6    Q    And then they typed it out and you signed
7  it?
8    A    Correct.
9    Q    Was it a taped statement or did you just --
10   A    I don't recall.
11   Q    Okay. And did you -- prior to meeting with
12  the two officers from MBI, did you meet with any
13  attorneys?
14   A    No.
15   Q    All right. And in your statement, did you
16  try to put in as much information and be as accurate
17  as you could?
18   A    Yes.
19   Q    And have you looked over this statement
20  prior to today's deposition?
21   A    Yes.
22   Q    Okay. And are there any corrections or
23  additions to this statement that you after looking
24  over it would like to make?
25        MR. SMITH:  You can take your time and read

1  the whole thing. I'll object to the form. You said
2  "corrections or additions." If something wasn't
3  asked, it might not be in there.
4    A    This is the information that was provided by
5  me on the questions that the investigator asked of me.
6  BY MR. MULLINS:
7    Q    All right. Was it a question-answer session
8  that you had?
9    A    There was a lot of questions, yes.
10   Q    Okay. And you -- this statement was typed
11  up and you read and you signed it. Correct?
12   A    That is correct.
13   Q    And on this statement, you stated that on
14  February 21st, 2012, at approximately 10:30 you
15  received a telephone call from Neshoba County
16  dispatcher Charity Hillhouse. Correct?
17   A    As I remember.
18   Q    So obviously prior to 10:30 p.m. a call was
19  made to Charity advising her about this stolen
20  vehicle?
21   A    Correct.
22   Q    All right. We agree that it was sometime
23  prior to 10:30 p.m.?
24   A    Correct.
25   Q    All right. And 911 dispatch logs on Exhibit

1  3, the first entry starts at 22:24. Correct?
2    A    I don't know where that call came in from.
3    Q    Okay. That's the first entry, though, on
4  this -- that I was provided.
5    A    It doesn't have a -- it doesn't have a name
6  to that first entry. You know, I couldn't answer when
7  the first call came in.
8    Q    Well, you would agree with me that the first
9  entry is 22:24?
10   A    Yes, sir.
11   Q    Okay. And it appears that the name on there
12  at the top is Linda Sanders? This area here
13  (indicating).
14   A    Yes.
15   Q    Have you seen these reports before?
16   A    No, sir.
17   Q    Okay. All right. Not this particular
18  report, but any of your 911 reports?
19   A    No, sir.
20   Q    This is the 911 system that's set up in
21  Neshoba County?
22   A    I'm not exactly for sure how it is set up.
23  The communications doesn't work under the sheriff's
24  office. They just dispatch for us.
25   Q    Okay. But the person is Linda Sanders, and

1  that's where the car was stolen from. Correct?
2    A    Correct.
3    Q    And her name is identified?
4    A    At the top.
5    Q    Okay. All right. So tell me what happened.
6  Dispatch called you, and pick it up from there and
7  tell me what happened.
8    A    All right. That night at approximately
9  10:30, 10:35 or something, it was -- you know, it was
10  getting later part of the night. I was at home. I
11  received a call from dispatch that the officers was in
12  pursuit of possibly a stolen vehicle.
13   Q    Let me stop you right there. You had just
14  started with the sheriff's department January 2012?
15   A    Yes.
16   Q    So you had been on the job about a month?
17   A    A month and a few days.
18   Q    Had you worked that day?
19   A    Yes.
20   Q    What was your -- what were your hours?
21   A    I don't have any set hours. I don't recall
22  exactly what time I got home that night, but it was
23  after dark.
24   Q    Okay. Do you remember approximately if you
25  went in in the morning?

1      A    Normally I leave home somewhere around 7:30
2 every morning.
3      Q    So somewhere -- and time change, so it was
4 dark, so it could be 7:30, 5:30, 6:30 at night?
5      A    It would probably have been after that. It
6 would have probably been later than that.
7      Q    All right. I'm sorry, I didn't mean to
8 interrupt. Go ahead. You got a call.
9      A    I got a call that there was a pursuit, that
10 officers was in pursuit of possibly a stolen vehicle.
11      Q    Okay. At the time that the officers were
12 dispatched, there were already officers who were
13 pursuing or looking for this car. Correct?
14      A    Correct.
15      Q    And the dispatcher was given the name of the
16 person that took the car. Correct?
17      A    I wasn't aware of that.
18      Q    You know that now -- or do you know that
19 now?
20      A    No, sir, I don't.
21      Q    Have you not listened to the 911 call in
22 this case?
23      A    No, sir, I have not.
24      Q    You have not talked to any of the officers?
25      A    Talked to them?

1      Q    About the fact that they were told who was
2 in the car.
3      A    I'm not aware if they were told or not. I
4 did not have that information.
5      Q    Did you -- were you familiar with a
6 gentleman by the name of Cruise Petty before this
7 night?
8      A    No, sir.
9      Q    Were you aware -- or I guess you're not
10 since you didn't listen to the audio, but did you know
11 that the officers were told that Cruise Petty was the
12 one in the stolen vehicle?
13      A    No, sir.
14      Q    And did you know that they knew he was
15 going -- or that they suspected he was either going to
16 a trailer park -- Kyle Trailer Park? Are you familiar
17 with that?
18      A    I am.
19      Q    Or Robinhood Circle. Are you familiar with
20 that area?
21      A    I am.
22      Q    But you did not know while this pursuit was
23 going on that the officers were having radio chatter
24 back and forth about that?
25      A    No, sir. Those locations you're mentioning

1 is on the opposite side of Philadelphia than where we
2 were.
3      Q    Okay.
4      A    I wasn't aware of anything about Robinhood
5 Circle.
6      MR. MULLINS: I'll get this marked as
7 Exhibit 5.
8      (Exhibit 5 was marked for identification and
9      is attached hereto.)
10 BY MR. MULLINS:
11      Q    All right. Can you identify this person in
12 that Exhibit 5?
13      A    It's got the name -- looks like somebody has
14 written the name under there Cruise Petty.
15      Q    Is that what purports to be a driver's
16 license picture?
17      A    Yes.
18      Q    Does it have Mr. Petty's -- what purports to
19 be an address for him?
20      A    Yes.
21      Q    And if you -- it also has his name typed out
22 in that area, too, doesn't it?
23      A    Yes.
24      Q    Driver's license number?
25      A    Appears to be.

1      Q    If a person calls in and identifies a
2 suspect and gives them a name, in your police
3 experience, can then the police pull up information
4 just like I have given you in Exhibit 5?
5      A    We can.
6      Q    All right. Now, at some point in time, you
7 decided to join in the chase, so to speak?
8      A    Correct.
9      Q    All right. What -- why did you make that
10 decision?
11      A    Well, I felt like it was my duty to -- if
12 there was anything -- since I was elected by the
13 people, if there was anything going on in the county,
14 it was my job to go assist the deputies in whatever
15 was going on.
16      Q    You have had training in pursuit?
17      A    Yes.
18      Q    All your deputies that were out there that
19 night -- let me see if I have them all. Deputy Clay,
20 Deputy Spears, Deputy Winstead. Did I leave anybody
21 out?
22      A    That's -- no. Clay, Winstead and Spears.
23      Q    And did they all have pursuit training, as
24 well?
25      A    I'm assuming the ones that had been to the

1 academy would receive training through the training
2 academy.
3      Q     And I don't mean to parse words, but do you
4 know for a fact if they did or not?
5      A     No.
6      Q     Okay.  Did all of your officers, did they
7 all go through the academy at one point in time?
8      A     Yes, yes.
9      Q     In your opinion, were they qualified to
10 handle a pursuit?
11      A     Yes.
12      Q     All right.  Yet you decided to leave the
13 house and go out and help them.  Correct?
14      A     Correct.
15      Q     All right.  Tell me what you did.
16      A     As a matter of fact, I had just laid down.
17 I had gotten up out of bed.  I got dressed.
18      Q     Let me stop you there.  Had you been asleep?
19      A     No.
20      Q     Okay.  But you but for the issue would have
21 been ready to go to sleep?
22      A     Actually, I was watching TV.
23      Q     All right.  So you got up, got dressed and
24 left?
25      A     Got dressed and I left and headed north on

1 Highway 15.
2      Q     All right.  At some point in time, you came
3 into contact with the car driven by Cruise Petty.
4 Correct?
5      A     Correct.
6      Q     At the time, did you know what crime had
7 been committed?
8      A     The information that I had -- and I don't
9 know -- it might have been given to me over the phone.
10 The information I had was that the officers was in
11 pursuit of this vehicle after getting call of an auto
12 theft.  The information I had, that there was -- when
13 the homeowner came home, my understanding that there
14 was individuals that ran out of that house and jumped
15 into the homeowner's vehicle and drove away.
16      Q     Anything else that you can remember?
17      A     No, sir.
18      Q     Were there any reports that you got that the
19 two boys were armed?
20      A     I didn't -- I did not know if they were
21 armed or not.
22      Q     That they -- anything about them taking the
23 car by force?
24      A     The only information I know is, you know,
25 like I stated, that when the homeowner got there, the

1 individuals ran from the home and stole the car.
2      Q     Were you told by anyone prior to the pursuit
3 or during the pursuit that Cruise had been over at a
4 girlfriend's house that lived at this house?
5      A     No, sir.
6      Q     And was caught by the grandmother?
7      A     No, sir.
8      Q     Were you aware that it was on the 911 tape?
9      A     No, sir.
10      Q     All right.  Any information that you had
11 prior to the time that these boys, Cruise Petty or my
12 client, Joseph McCarthy, had been a serious physical
13 danger to anyone at that house?
14           MR. SMITH:  Object to the form.  You can
15 answer if you know.
16      A     Would you repeat that question?
17 BY MR. MULLINS:
18      Q     Sure.  Did you have any information or were
19 told anything that Cruise Petty or Joseph McCarthy had
20 been a threat to cause anybody serious bodily harm at
21 that house?
22      A     The only information I had, first, I didn't
23 know it was Joseph McCarty Cruise Petty.  I had no
24 names of the individuals.  The only information that I
25 had was that when the homeowner came in, the

1 individuals ran from the home and took the vehicle.
2 That's the only information I had.
3      Q     Based on that, would that information give
4 you any indication that these boys posed a threat, a
5 serious threat to the homeowners or anyone else?
6           MR. SMITH:  Object to form.  That calls for
7 pure speculation.  He's told what you he knows.
8 BY MR. MULLINS:
9      Q     Well, based on your law enforcement
10 experience.
11           MR. SMITH:  Same objection.  I mean, you
12 don't have to answer that if you don't know.  He is
13 asking you to speculate.
14      A     I don't know, sir.
15 BY MR. MULLINS:
16      Q     Well, they didn't have any weapons.  They
17 didn't have a knife.  Correct?
18      A     I don't know that.
19      Q     Well, when you assess a pursuit situation,
20 you have to know the seriousness of the offense.
21 Correct?
22      A     I had the information that the individuals
23 came from the home, took the vehicle.
24      Q     Sure.
25      A     And that's what -- that's why the pursuit

1 had started.
2 Q Well, when you address a pursuit situation,
3 you have to first determine the seriousness of the
4 offense. Correct?
5 A If it was a felony or a misdemeanor, yes.
6 Q And if it was, for instance, a murder, armed
7 robbery, or some other type of felony. Correct?
8 A At that time, I didn't know if it was -- you
9 know, what kind of force they had used to take the
10 vehicle.
11 Q Right. But what I'm saying is -- is that
12 it's important to know that type of information.
13 Correct?
14 A Yes, sir.
15 Q Okay. I mean, based on your own pursuit
16 policies, that's what it says. Correct?
17 A Yes, sir.
18 Q All right. And let's go ahead and get the
19 policies and procedures admitted.
20 (Exhibit 6 was marked for identification and
21 is attached hereto.)
22 BY MR. MULLINS:
23 Q So based on the information you knew at the
24 time, let's start with when you picked the car up.
25 Tell me what happened.

1 A When I picked the car up?
2 Q When you first came in and joined the
3 pursuit.
4 A Okay. I got to the intersection of Highway
5 15 and County Road 351. As I got to that
6 intersection, there was a vehicle that was -- came to
7 the intersection. I directed her to back away -- it
8 was a female -- and told her that there was a vehicle
9 headed in that direction. Shortly during this time,
10 there was a second vehicle that was actually headed on
11 state Highway 15 headed north. I had already turned
12 on all my emergency lights and I was sitting in the
13 southbound lane. I directed that vehicle to take the
14 side road to clear the roadway for their safety, and,
15 of course, I was trying to monitor the pursuit where
16 the vehicle was located.
17 I could tell they were getting pretty -- you
18 know, fairly close. I kept watching, and then I seen
19 the blue lights coming up behind me. At that time, I
20 started pulling off to try to build my speed up hoping
21 that maybe I could get in front of the vehicle to slow
22 it down. At some point, the officers told me to be
23 careful, that -- he said, "He will ram you." I had
24 already -- I already had the information that he had
25 rammed one of the patrol cars which I believe was Coby

1 Clay, hit him in the rear end.
2 As I was sitting there, there was a third
3 vehicle that actually got past me, and I knew that the
4 driver didn't have any headlights on. Then I seen the
5 blue lights of the patrol cars. It's sort of like
6 where I was sitting, between me and where the suspects
7 and the officers was approaching me, it's a hill, a
8 small hill. I could see the blue lights, but I
9 couldn't see the headlights. Then at that time --
10 MR. SMITH: When you say you couldn't see --
11 you need to talk about which car you couldn't see
12 headlights on because you have a sheriff's car with
13 blue lights and then you have the suspect -- I'm not
14 trying to interfere, but it's going to be very --
15 later on, we won't know which car didn't have
16 headlights.
17 MR. MULLINS: I was going to come back and
18 ask that.
19 A To begin with, I saw the flashing of the
20 blue lights because, you know, the flashing of the
21 blue lights will be above the headlights. And then I
22 seen the vehicle that got past me, and I could see him
23 hitting his brakes and you could tell that he veered
24 off the road quickly. And then the patrol cars came
25 over the little grade and I could -- I could see --

1 you know, I could see somewhat of a figure of the
2 vehicle in front with no headlights on.
3 BY MR. MULLINS:
4 Q That would have been the car Cruise Petty
5 was in?
6 A Correct, that was that vehicle.
7 Q All right. And as they got closer, tell me
8 what you did.
9 A I proceeded. I tried to pull off to try to
10 get ahead. At that time, the vehicle came by me, and
11 of course there was some debris and stuff that was
12 hitting, sprinkling my patrol car. It appears to be
13 parts of the rim.
14 Q Let me ask you to stop right there. At one
15 point the time, the car that Petty was in was only
16 driving on a rim. Correct?
17 A Yes.
18 Q Sparks were flying from it?
19 A Yes.
20 Q Was it on the rim when it passed you?
21 A Yes.
22 Q Okay. Thank you. And could you at anytime
23 determine how fast that car was going?
24 A No, sir.
25 Q How fast were you going?

1   A   I never did really look down. Greater than
2  the speed limit, but not at -- you know, not at a
3  speed -- 75, 80 is maybe the highest I ever got.
4   Q   That was while you were chasing him?
5   A   Correct.
6   Q   Where you pulled off the road and you
7  encountered them, were you able to get in front of
8  them?
9   A   Excuse me?
10   Q   When you pulled and you were waiting for
11  them, did you get in front of them and they passed
12  you? Is that how it went down?
13   A   Actually, I started pulling off, and I
14  didn't have time to build my speed up and they just
15  shot right by me.
16   Q   15 at this point, is it two lane?
17   A   Correct.
18   Q   So did they have to get into the left lane
19  to pass you?
20   A   They were already in the left lane. That's
21  why the -- that's why the third vehicle that got past
22  me, why he had to leave the roadway, because that
23  vehicle was in his lane.
24   Q   I've got you. All right. So Petty is past
25  you. You're following behind. Pick it up there and

1  tell me what happened and what you did.
2   A   Okay. At that point, the vehicle proceeded
3  south on 15. At times, it was in the opposite lane.
4  Sometimes he would change over to the -- to the
5  southbound lane. It appeared every time that a unit
6  would try to get around him he would ease over as far
7  as the patrol unit.
8   Q   At this time that you were there, were any
9  shots fired at that Petty vehicle?
10   A   No, sir. No, sir.
11   Q   Do you know if shots were fired anytime?
12   A   At what point?
13   Q   Good question. Prior to you getting
14  involved.
15   A   No, sir.
16   Q   Continue on. The car was going from lane to
17  lane to keep the officers from passing.
18   A   Yes, sir. I do remember after I joined the
19  pursuit there was a fourth vehicle that was headed
20  north on 15 because I had concerns maybe, you know,
21  for their safety. Then we traveled a short distance,
22  and that's when the vehicle was stopped or --
23   Q   How many -- including yours, how many patrol
24  cars were out there?
25   A   Including mine, it was a total of three.

1   Q   All right. The area that we are talking
2  about on Highway 15 in Philadelphia, it's a two-lane
3  road. Correct?
4   A   Correct.
5   Q   Can you tell me what the traffic is usually
6  like at 10:30 at night? Heavy? Light?
7   A   It depends. I would say that night -- that
8  night, I would say that it was fairly light because I
9  remember seeing a total of -- while I was waiting for
10  the pursuit and during, I remember encountering the
11  four vehicles. Let's see. Yes, the four vehicles.
12   Q   Okay. In this area where the pursuit was
13  taking place, are there houses up and down 15?
14   A   Somewhat, yes.
15   Q   Is it heavily populated or is it just
16  country road?
17   A   It's a state highway, but it's not -- it's
18  not a heavily populated neighborhood.
19   Q   Okay. The officers that were with you that
20  we have discussed, Spears and Winstead and Clay, how
21  long have they been police officers that you can
22  recall?
23   A   I'm not for sure when they were -- they were
24  hired under a different administration. They were
25  already working for the sheriff's department when I

1  took over as sheriff. Now, Winstead -- now, Winstead
2  was hired under my administration.
3   Q   Okay. You personally hired him?
4   A   Correct.
5   Q   Do you know how long he was a police
6  officer?
7   A   He had been on auxillary and he had worked
8  for 911 communications. And after I came on, I
9  believe he was on auxiliary, and I hired him from
10  that.
11   Q   Do you know how long he was on auxiliary?
12   A   No, sir.
13   Q   But you can't -- two years as a police
14  officer? Three years? Twenty years? I mean, do you
15  know these --
16   A   No, sir. It would have been a short while
17  for him.
18   Q   How about Clay and Spears; do you know?
19   A   I'm not for sure.
20   Q   Were they young men in their 20s or 30s?
21   A   Jonathan would be probably late 20s.
22   Q   Which one is Jonathan?
23   A   Jonathan Spears.
24   Q   Okay. How about deputy Clay?
25   A   I'm not sure of his age, but he is younger

1 than I am.
2     Q    Okay. Now, obviously there was a
3 determination made by you to stop the vehicle?
4     A    Correct.
5     Q    Tell me how you made this determination.
6     A    The information I had, based on, you know,
7 the original call, based on the manner that he was
8 driving, for the fact that I almost seen him, you
9 know, hit the third vehicle that I mentioned that had
10 to leave the roadway, for the purpose of him driving
11 in the wrong lane at that rate of speed, no headlights
12 on at that time of the night. For those reasons, you
13 know, for the safety of the other motorists.
14     Q    And what did you order be done?
15     A    To be done?
16     Q    Yes, sir.
17     MR. SMITH: Let me -- he left out -- he said
18 it earlier, but he said that they had rammed a
19 deputy's car, too.
20     A    Yes, sir. I had that information.
21     MR. SMITH: I'm not trying to testify. He
22 said that earlier, but he can't remember everything.
23     A    Yes, sir.
24 BY MR. MULLINS:
25     Q    That's fine.

1     A    For all the information that I had that was
2 taking place, the whole situation, I, you know, told
3 the officers to put him in the ditch.
4     Q    How is that done?
5     A    Well, it can be done several ways. If we
6 can -- my intentions was -- the reason I was sitting
7 in the lane is what we call a rolling roadblock where
8 there's a vehicle in front and maybe one to the side
9 that we can carry him to the side of the road, you
10 know. I just told them, you know, we had to put him
11 in the ditch.
12     Q    All right. How is that -- how was that done
13 that night? How was -- how were your officers trained
14 to put someone in the ditch?
15     A    I'm not really for sure. I'm not really for
16 sure how it was done. I just know that the vehicle
17 lost control shortly after that -- well, no, he had
18 already traveled quite a ways. I'm not for sure. I
19 never did see.
20     Q    Well, you made the call --
21     A    Yes, I did.
22     Q    -- the order? When you made that order,
23 what did you expect the deputy -- which one was it?
24 Was it Deputy Clay?
25     A    I'm not for sure which one was the lead

1 vehicle.
2     Q    How did you expect him to put him in the
3 ditch; I mean, beep his horn and ask him to pull over?
4     A    Well, I knew he wasn't going to do that.
5     Q    Tell me what you expected him to do.
6     A    At that time, I didn't -- just I wanted the
7 pursuit to end.
8     Q    Sure.
9     A    And I just -- that was my words, Put him in
10 the ditch and let's end it.
11     Q    By taking his patrol car, the deputy's car,
12 and ramming it or hitting Petty's car. Correct?
13     A    I didn't ever use those words. That was
14 never said.
15     Q    What is the pit maneuver? Are you familiar
16 with that?
17     A    I am.
18     Q    What is that?
19     A    Pit maneuver is where you pull alongside of
20 the car and tap the rear of it and it spins out of
21 control.
22     Q    Is that what you ordered to be done?
23     A    No, sir.
24     Q    Again, what did you order these deputies to
25 do?

1     A    I just ordered him to put him in the ditch.
2 I didn't say, you know, "Let's do the pit maneuver."
3 I just said, "Put him in the ditch."
4     Q    So you're sitting here today under oath --
5     A    Yes.
6     Q    -- and your testimony is you did not tell
7 the deputies to use their vehicles to bump the car in
8 which Cruise Petty and my client were in?
9     A    I think my exact words were, "Put him in the
10 ditch."
11     Q    And you did not know how they were going to
12 accomplish that?
13     A    No, sir.
14     Q    How did you expect they were going to
15 accomplish that, Sheriff?
16     A    Whatever means it took to end it.
17     Q    Would that include bumping his car?
18     A    Possibly.
19     Q    Okay. You knew that when you told them to
20 put him in the ditch that that could be one way they
21 could put him in the ditch?
22     A    Correct.
23     Q    All right. And at that time in your
24 understanding of what was going on and all the facts
25 you had, it was your opinion that deadly force was

1 justified at that time?
2     MR. SMITH:  Object to the form.  He never
3 said deadly force.
4     MR. MULLINS:  That's my question.
5     MR. SMITH:  And that's my objection.
6 BY MR. MULLINS:
7     Q    You can answer.
8     A    Answer?
9     Q    Yes, sir.
10    A    I didn't want deadly force to be used.
11    Q    My question is this:  At the time that you
12 ordered the car to be put in the ditch, was it your
13 opinion based on all the facts that you knew and being
14 the supervisor out there --
15    A    Yes, sir.
16    Q    -- that deadly force was justified?
17    A    I never did order any --
18    Q    That's not my question.  I asked you, do you
19 think it was justified at that time?
20    MR. SMITH:  Object to the form.
21    MR. MULLINS:  Sure.
22    THE WITNESS:  Do I need to go ahead and
23 answer his question?
24    MR. SMITH:  If you understand and know,
25 yeah, you can give an answer.

1     A    Well, that was not an order to use deadly
2 force.  I was just ready to end the pursuit.
3 BY MR. MULLINS:
4     Q    Sure.  Let me ask my question again and see
5 if I can get an answer.  Based on what you knew at the
6 time, all the facts and circumstances, everything that
7 you have accounted and even what Roy added, do you
8 think deadly force was justified to be used at that
9 time?
10    A    No, sir.
11    Q    Okay.  Let me show you -- did you know that
12 ramming or bumping or an intentional contact between a
13 sheriff's car and a suspect's car should only be done
14 if deadly force is otherwise justified by the
15 department's use of force policy?
16    A    No, sir, not at that time.
17    Q    I'm going to show you your own policies and
18 procedures.  Those are them.  Right?  Exhibit 6?
19    A    Yes.
20    Q    Let me flip over to where I was just at.
21 Pursuit tactics.  Number 4 under pursuit tactics, do
22 you see where I'm at there?
23    A    Yes, sir I see it.
24    Q    According to your own policies and
25 procedures on ramming or bumping a suspect vehicle, it

1 can only be done by a supervisor.  Correct?
2     A    Right.
3     Q    And only if deadly force is otherwise
4 justified?
5     MR. SMITH:  Object to the form.  It says
6 authorized except by a supervisor.
7 BY MR. MULLINS:
8     Q    Sure.  Right.  You can order somebody to do
9 it.  Correct?
10    A    Correct.
11    Q    But only if deadly force -- deadly force is
12 justified.  Is that what your own policies and
13 procedures state?
14    A    That's what it says.
15    Q    All right.  But based on your testimony, you
16 did not feel that deadly force was even justified at
17 the time.  Correct?
18    MR. SMITH:  Object to the form.
19    MR. MULLINS:  He's already answered it.
20    MR. SMITH:  What?
21    MR. MULLINS:  He's already answered it.
22    MR. SMITH:  Okay.  Well, I'll object to the
23 form because you're misleading him, and he's already
24 testified about him putting other people in danger of
25 being killed.

1     MR. MULLINS:  Don't testify.  Just object
2 and let's move on.
3     MR. SMITH:  And then he made a decision.
4     MR. MULLINS:  Hold on, now.  Object to the
5 form and let's leave it at that.
6 BY MR. MULLINS:
7     Q    Did you understand my question?
8     A    Which question?
9     Q    The last question.
10    A    On the policy on this?
11    Q    Yes, sir.  You have already said deadly
12 force was not justified.  Correct?
13    A    That's what I said.
14    Q    All right.  And you see where the policy
15 said it must be justified in order to put someone in
16 the ditch or run them off the road.  Correct?
17    A    Number 4.  Yes.
18    Q    Were you even aware that this policy and
19 procedure existed prior to this pursuit?
20    A    I had just taken office, you know, getting
21 everything in place.  I wouldn't have been familiar
22 with word for word on all policies by the sheriff's
23 office.  Like I said, I had been sheriff just a short
24 period of time.
25    Q    Did you -- were you familiar with this

1  pursuit policy?
2      A   Not completely.
3      Q   All right.  Were you aware that pursuits --
4  before you start a pursuit that you determine the
5  seriousness of the offense?
6      A   Yes.
7      Q   All right.  Did you know that when you're
8  doing your pursuit and deciding whether to continue
9  the pursuit, one thing to take into account is if you
10 know who is actually in the other vehicle?
11     A   Yes.  But I did not know who was in the
12 vehicle.
13     Q   But your other deputies may have?
14     A   I can't answer that.
15     Q   But you made a decision to pit the vehicle
16 and told your other officer to do it without knowing
17 whether they knew who was in the vehicle.  Correct?
18         MR. SMITH:  Object to the form.  You can
19 answer.
20     A   Repeat your question, please.
21 BY MR. MULLINS:
22     Q   Sure.  I mean, the 911 calls that we have,
23 that your attorney has, that I have, show that
24 dispatch informed the officers who was in the car.
25     A   Yes, sir.

1      A   If --
2      Q   I'm sorry, were you finished?
3      A   If we had stopped the pursuit, who is to say
4  they wouldn't have continued traveling with no
5  headlights.
6      Q   Your policies and procedures -- and I'll let
7  you look at this -- state, "Pursuits may be terminated
8  if the suspect's identity has been determined;
9  immediate apprehension is not necessary to protect the
10 public or officers; and apprehension at a later time
11 is reasonably feasible."
12     A   Yes, I --
13     Q   Do you see that?
14     A   Yes, sir, I do.
15     Q   So taking my representations, we knew who
16 they were.  Correct?  We knew one was Cruise Petty.
17     A   I didn't know that.
18         MR. WHITE:  Object to the form.
19 BY MR. MULLINS:
20     Q   Taking my representations that the dispatch
21 had already told your deputy --
22         MR. SMITH:  He didn't know that.  You're
23 asking him --
24         MR. MULLINS:  Right.  I'm asking him to take
25 my representation.

1      Q   They knew his name?
2      A   Yes, sir.
3      Q   They determined at least two addresses where
4  he may be heading, correct, accepting my
5  representation to you, Sheriff?
6      A   At that time -- yes, at that time, I did not
7  have that information.
8      Q   You didn't know that?
9      A   No, sir.
10     Q   Were you aware that dispatch had made the
11 other officers who were in pursuit aware of that?
12     A   No, sir.  I don't recall having any of that
13 information.
14     Q   Isn't that something you take into account,
15 hey, we can back off the pursuit and get these guys
16 later?
17     A   During that time, I was thinking of the
18 safety of the other motorists because they were
19 traveling with no headlights on.  I didn't know if the
20 car even had headlights or not.  All I know is that
21 they were not on.  They were traveling in oncoming
22 traffic.  My concern at that time was the safety of
23 the other motorists on the highway.
24     Q   And your policies and procedures, which we
25 have referenced, cover that.

1  BY MR. MULLINS:
2      Q   If your deputies knew who was in the
3  vehicle, that's a factor they can take into account in
4  terminating a pursuit.  Correct?
5      A   I didn't have the information.
6      Q   Sure.
7      A   If they knew who -- I'm not really for sure
8  what you're asking me.
9      Q   Well, I mean, these are the policies and
10 procedures which you and your deputies must follow
11 when you're engaged in a pursuit.  Correct?
12     A   Correct.
13     Q   You today are sitting here stating you
14 didn't even know who was in the vehicle.  Correct?
15     A   That's correct.
16     Q   Did you ask your deputies, Hey, do y'all
17 know who is in the that vehicle?
18     A   I did not.
19     Q   And that's one thing that your own policies
20 and procedures state that you should know or you
21 should find out when you're making a determination on
22 pursuing vehicles.  Correct?
23     A   That's what it says, yes.
24     Q   And these guys had already been on the
25 pursuit and you joined in.  Did you ever ask them this

1 information?
2     A   I don't recall asking them, no.
3     Q   Did you ever say, Hey, are these guys armed
4 and dangerous?
5     A   I don't think the officers would have known
6 that, you know, because they hadn't came in contact
7 with them. They only came in contact with the fleeing
8 vehicle.
9     Q   Well, did they know from dispatch? Don't
10 they give that kind of information usually?
11     A   If they were armed or dangerous?
12     Q   Yes, sir.
13     A   Well, I would say with their actions they
14 were dangerous.
15     Q   Based on what?
16     A   Well, the manner, the way they were driving,
17 the information that they already rammed a patrol car.
18 That's not usually anybody's nature to ram a patrol
19 car. I would take that as, you know, trying to cause
20 harm to an officer. You and I, I don't think we would
21 have acted that way. I'm sure you wouldn't. I know I
22 wouldn't have acted that way, even if we were trying
23 to allude the police officers. I took that to be, you
24 know, dangerous for the officers.
25     Q   Okay. But prior to that time, did dispatch

1 relay any information that you're aware that that
2 would have told these police officers that they were
3 armed and dangerous?
4     A   I don't know if the -- I don't know that
5 dispatchers would even have that information.
6     Q   Well, if the person calling 911 would say,
7 Hey, somebody just broke in my house and they had a
8 bat, a gun and a knife, then the dispatcher would turn
9 around and tell that to the deputy. Correct?
10     A   If that information was provided to
11 dispatch. But in most cases, a lot of information is
12 not gathered from the -- from the caller.
13     Q   But you don't know what was gathered in this
14 case, do you?
15     A   No, sir.
16     Q   Not only did you not know at the time, but
17 you don't know sitting here today?
18     A   No, sir.
19     MR. SMITH: Object to the form.
20 BY MR. MULLINS:
21     Q   Correct?
22     A   No, sir.
23     Q   All right. Isn't it important before you
24 make the decision that you made to have all the facts
25 and circumstances?

1     A   In most cases, it's important, but in most
2 cases, we don't have all the facts.
3     Q   But if you had the ability to have all the
4 facts, Sheriff, isn't it important to have them?
5     A   Yes, sir, if you can gather them.
6     Q   Sure.
7     A   But in most cases, we don't have all the
8 facts.
9     Q   So after the vehicle was rammed off the
10 road, did it flip?
11     A   Yes.
12     Q   Okay. And how many times, if you recall?
13     A   Maybe once.
14     Q   All right. And it ended up on its tires?
15     A   Yes.
16     Q   I'll show you the picture and see if that
17 appears to be the car.
18     A   It is, yes.
19     Q   That's the passenger's side. Correct?
20     A   Correct.
21     Q   Does that show whether the passenger's side
22 window is either broken or down? It's not there,
23 regardless?
24     A   Yes.
25     Q   And skipping ahead, is that the way it was

1 when you came upon the vehicle? The window, I mean.
2     A   The door wasn't open.
3     Q   But the window was --
4     A   But the window was out or down.
5     Q   Okay. Let me see that. This is a better
6 side angle. Same vehicle. Correct?
7     A   Yes.
8     Q   Okay. Let me get this one -- that's the
9 final resting point from a different point of view
10 from the Highway 15. Is that correct?
11     A   Yes.
12     MR. MULLINS: All right. Let's go ahead and
13 get those marked.
14     (Exhibits 7, 8 & 9 were marked for
15     identification and are attached hereto.)
16     MR. WHITE: Chuck, do you mind if we take a
17 quick break?
18     MR. MULLINS: Not at all.
19     (Off record at 11:28 a.m.)
20     (On record at 11:39 a.m.)
21 BY MR. MULLINS:
22     Q   Sheriff, we've got the car, it's been rolled
23 over and it's on the side of the road. Pick me up
24 from there and tell me what happened.
25     A   Okay. I got out of my patrol car. The car

I was driving at the time was fully marked. I got out
and I approached the passenger's side, and Officer
Clay approached the front of the vehicle, as I
remember, and Deputy Spears was on the passenger's
side next to me.

Q    Okay.

A    As we approached the vehicle, we were giving
commands for them, to, you know, show their hands,
which they failed to do so. I had my service weapon
drawn. Cruise, which later I learned to be Cruise
Petty, and later learned to be Joe McCarthy, or
Joseph, was in the passenger's seat. I reached in
through the broken window to try to take control of
apprehend the passenger. You have to keep in mind,
all this happened within just a matter of a very few
seconds. That's when I heard the weapon discharge.

I had reached in to get control of him, and
that's when I heard at that time what appeared to be a
gunshot. You have got to understand, it was all
just -- you know, it happened so quick. And my first
reaction was, because at that time not realizing, I
asked who shot.

Q    You didn't even realize it was your weapon?

A    No, sir, not at all. I mean, at that time,
it just -- you know, what reason. And somebody said,

"Sheriff, I believe it was your gun." And at that
time, Cruise Petty was lying -- as we approached the
vehicle, you could see two bodies -- two figures.
When the gun shot, Cruise Petty was laying across the
seat. My first thought, oh my God, I have hit him.
And I was giving a command to check him to make sure,
because McCarthy was still sitting upright.

Officer Clay, I believe, took Petty out of
the vehicle and laid him on the ground and was looking
him over. I went around to see, and then I got to
question to the officers, "Who was hit? Is any of
y'all hit?" They said, "No, we are okay."

I came back around, and I remember Spears,
Jonathan Spears, said, "Sheriff, I think it's the
passenger. He's got some blood on him." And I
just -- I asked them was medical EMS on the way, to
get them here and get them here quick. Of course, I
know it didn't take as long as it seemed, but it
seemed like it was an eternity before the ambulance
got there.

Q    Now, when you got upon the scene and you're
approaching the vehicle -- you're left handed?

A    Yes, sir, I am.

Q    You had your gun, weapon, in your left hand?

A    As I was approaching?

Q    Yeah. I mean, is that not right? Which
hand?

A    Yes, sir, I had it in my left hand, but also
I had control of it with both hands.

Q    Okay. That's what I was -- you had two
hands on the weapon?

A    Yes, approaching the vehicle.

Q    How was the area as far as lighting is
concerned?

A    It was dark at night. The roads there are
not lit by any streetlights or anything.

Q    Did y'all use flashlights or anything?

A    I didn't have one. I don't recall if the
other officer had one or not, but I did not have a
flashlight.

Q    I believe you said you and another officer
went to the passenger's side?

A    Yes.

Q    Spears went to the front?

A    No.

Q    Clay?

A    Clay.

Q    So Spears was on your side?

A    Yes.

Q    And I guess Deputy Winstead went to the

driver's side?

A    I'm not really for sure where Winstead went.

Q    Did y'all go up there with a -- you go this
way, I go that way? How did y'all decide who went
where?

A    No, sir. Actually, you know, there was no
communications on -- I didn't direct Clay to go to the
front of the car and go around to the driver. I
didn't direct Spears to go where he went. That's just
the way we ended up. Like I said, when I heard the
shot, at that time, I did not know it was my fault.

Q    Okay. When you were approaching the vehicle
before going to the passenger's side, did you stand
back and ask the suspects to move and get out of the
vehicle?

A    Do what, now?

Q    Did you tell them to get out of the vehicle?

A    As we exited the vehicles, ours, approaching
them, we were hollering for them to get their hands up
which is -- that's the way we are trained. They were
given those commands, and I'm sure -- I mean, I'm sure
we were probably telling them to get out of the
vehicle and get your hands up. That would be normal.

Q    Okay. You were telling them to get out of
the vehicle and get your hands up?

1     A    Get your hands up, you know.

2     Q    All right. And what movement did you see

3 coming from the vehicle?

4     A    The only thing I seen at that point, I seen

5 two figures or two different individuals. At that

6 point, I knew that there was one in the driver's seat.

7 I knew there was someone in the passenger. I didn't

8 know for sure if anybody was in the rear seat or the

9 floorboard. As I approached the vehicle -- this is

10 all taking place at the same time -- looking in, also,

11 I looked for if there was a third person.

12     Q    Okay. But did you see anybody inside the

13 vehicle moving?

14     A    Like how?

15     Q    Reaching for a weapon or moving around in

16 any way or trying to get anything from the glove

17 compartment.

18     A    I mean, I'm sure they were moving in the

19 vehicle, you know, but I didn't know if they had a

20 weapon or not. I didn't know what was inside the

21 vehicle.

22     Q    One of the deputies in the report said

23 Cruise Petty was knocked unconscious. Do you recall

24 seeing that?

25     A    As I was approaching the vehicle, the way I

1 recall it, Cruise Petty was sitting up.

2     Q    Let me show you Deputy Clay's statement and

3 direct you to first sentence on the second page.

4     A    That doesn't ring a bell. I'm telling you

5 the way I recall it.

6     Q    Sure.

7     A    I see two, and then he was laying across the

8 seat, and that's why I panicked thinking that I

9 accidentally shot --

10     Q    Him?

11     A    -- him. Because as I'm getting out, I'm

12 seeing two people, but after the shot, I'm seeing him,

13 as I said earlier, laying across the seat.

14     Q    Right.

15     A    And that's why I asked is he okay because,

16 you know, I mean, I wasn't -- you know, I wasn't

17 intentionally shooting at anyone or no one. The gun

18 went off, and at that time I had no idea where that

19 bullet went. I even questioned, "Is everybody okay,"

20 you know, because McCarthy is still sitting upright in

21 the seat. At that point, it appeared to me that there

22 was nothing wrong with him. So I focused on the

23 driver and the other officers to make sure, hey --

24 then, you know, I'm thinking, well, maybe the bullet

25 might have hit somewhere else other than anybody until

1 then it was brought to my attention that it was

2 Joseph.

3     Q    At the time you were approaching the

4 vehicle, you don't recall if any of the deputies had

5 flashlights shining into the interior of the vehicle

6 to help you guys see?

7     A    No, sir, I don't. I'm not saying that they

8 did not, but I'm not for sure.

9     MR. MULLINS:    Let's get Deputy Clay's report

10 marked since we have referenced it.

11     (Exhibit 10 was marked for identification

12     and is attached hereto.)

13 BY MR. MULLINS:

14     Q    And I believe you -- this is your affidavit

15 that you signed. You can take time to read it if you

16 want to.

17     A    Yes, sir, this is the affidavit I signed.

18     Q    You know you signed that under oath just

19 like you were testifying here today?

20     A    Yes, Yes.

21     MR. MULLINS:    Let's get that marked

22 Exhibit 11.

23     (Exhibit 11 was marked for identification

24     and is attached hereto.)

25 BY MR. MULLINS:

1     Q    And you mentioned that neither one of the

2 suspects in the car showed their hands. Is that

3 correct?

4     A    That's correct.

5     Q    I'm going to give you both your affidavit

6 and your statement which we referenced earlier that's

7 Exhibit 4 and Exhibit 11. In either of those

8 documents, the statement that you gave the day after

9 this happened or your affidavit you gave in connection

10 to this lawsuit, did you ever mention that either of

11 the suspects failed to show hands?

12     A    It don't say if he did or did not.

13     Q    Okay. That was in your statement

14 February 22nd. You can look at your affidavit and see

15 if you put in your affidavit where they failed to

16 show -- put their hands up. See if you mentioned it

17 in that.

18     A    No, sir.

19     Q    Okay. Now, I'm going to go back to

20 something because I can't remember what you said, and

21 I'm sorry, but do you recall seeing Mr. McCarthy or

22 Cruise Petty moving around in the car at all as you

23 approached?

24     A    There would have been some movement inside

25 the vehicle. Like I said, when I first got out, I

1 seen two people, and then later I remember seeing the
2 driver laying across the front seat.
3     Q    Laying across the front seat. But what I'm
4 saying, as you're approaching, did you see
5 Mr. McCarthy moving around like he is trying to get
6 somewhere?
7     A    I could see movement in the car.
8     Q    Describe what you saw.
9     A    Just, you know, body movement in the car. I
10 couldn't see what was in his hands, if he had
11 anything. But, you know, I did see -- you know, I
12 seen movement in the car, but, you know, not knowing
13 what the movement, you know -- just body movement in
14 the car.
15     Q    Did you ever -- in either Exhibit 4 or
16 Exhibit 11, did you ever mention to the investigators
17 or in the affidavit that you saw movement in the car?
18     A    No, sir, it's not in there.
19     Q    Now, as you approached the vehicle, the
20 gun's solely in your left hand as you're reaching in
21 the car?
22     A    As I was approaching, the gun was in both
23 hands.
24     Q    At some point in time, as you're reaching in
25 the window, you separate your right hand from the gun?

1     A    I'm left handed. Yes.
2     Q    Okay. The gun is, for lack -- it's locked
3 and loaded?
4     A    Yes.
5     Q    And as you're reaching in, your finger is on
6 the trigger?
7     A    I don't recall my finger being on the
8 trigger.
9     Q    Safety is off?
10     A    It doesn't have a -- it doesn't have a
11 safety.
12     Q    All right. And as you were reaching in,
13 tell me what you were doing as you were reaching in
14 the vehicle.
15     A    My main concern at that time was to get the
16 passenger, since I was on the passenger's side, to get
17 him under my control, you know, where I can secure him
18 because, you know, we have a dangerous job, and when
19 you approach a vehicle, you don't ever know what
20 you're -- what the situation is going to lead into.
21 But that was my first thought was to get control of
22 the passenger since I was on that side.
23     As I approached, when I reached in, then my
24 firearm would have been in my left hand. And I
25 reached in to get control of him, and I can't explain

1 it, I mean, because, you know, like I said, you know,
2 when I heard the shot, at first it was like I didn't
3 think it was my gun because why should it have went
4 off, because I had no intentions of it going off. I
5 thought my hand was off the trigger, but --
6     Q    But your gun was tested later?
7     A    Yes.
8     MR. SMITH: Before you -- just for the
9 record, because this -- he did a hand signal with his
10 right hand reaching in the car, but he never said
11 that, that he reached in with his right hand. He did
12 that, and if we had a video to show that -- but just
13 for the record...
14 BY MR. MULLINS:
15     Q    And let's clarify. Roy is right; we need a
16 clean record. When you reached in the vehicle, which
17 hand did you reach in with?
18     A    Okay. I reached in with my right hand
19 because it was my free hand.
20     Q    Sure.
21     A    Because I'm left handed, and the gun would
22 have been controlled by only my left hand at that
23 time.
24     Q    And the gun hand, the left hand, obviously
25 was in the vehicle, as well?

1     A    I can't say.
2     Q    All right. Is it your testimony that the
3 gun was outside of the vehicle?
4     A    No, sir, it's not.
5     Q    Okay. There's only two options.
6     A    Yes, sir. I'm saying I can't say either way
7 because I had reached in. It's a good possibility
8 that my left hand could have been inside the car when
9 I was reaching in.
10     Q    Okay. Well, looking at this vehicle -- and
11 I'll show you any picture you want to see -- if your
12 gun hand was outside the vehicle, and let's assume the
13 door is closed -- and I can show you that picture as
14 well -- and you were reaching inside and the gun was
15 outside, would the gun not have hit the outside of the
16 vehicle?
17     A    It's possible. It depends on where it was
18 at. You know, I'm trying to answer these questions as
19 truthful as I recall it.
20     Q    Yes, sir.
21     A    And I'm not denying that my left hand was
22 inside the window. It's a good possibility it was.
23     Q    Okay. And is there -- let me get back to --
24 your gun was tested by the Mississippi Crime Lab.
25 Correct?

1      A    I'm assuming it was.  I released it to them.
2      Q    And based on your knowledge, there was
3 nothing -- the gun did not manufacture -- wow --
4 malfunction?
5      A    No, sir.
6      MR. MULLINS:  Let's go ahead and get this
7 marked.
8            (Exhibit 12 was marked for identification
9            and is attached hereto.)
10 BY MR. MULLINS:
11     Q    Do you know where that gun is today?
12     A    Yes, sir, I do.
13     Q    Where is it?
14     A    I have it.  It's in my possession.
15     Q    And you didn't have to get it fixed or --
16     A    No, sir.
17     Q    What I'm showing you, Exhibit 12, is where
18 your gun was tested at the Mississippi Crime Lab.
19     A    Yes, sir.
20     Q    Okay.  So there was no malfunction in the
21 gun that night.  Correct?
22     A    Not to my knowledge, there was not.
23     Q    Was there any basis to use deadly force on
24 Joseph McCarthy at the time he was shot?
25     A    I didn't intend to shoot him.

1      Q    I understand that.  Was there any basis to
2 use deadly force on him?
3      MR. SMITH:  Object to the form.  Just to
4 clear something up, when you asked him earlier about
5 deadly force --
6      MR. MULLINS:  I don't want you testifying.
7      MR. SMITH:  I want to tell you what he asked
8 me.
9      MR. MULLINS:  Just tell me off the record.
10 I don't want to suggest any answers to the witness.
11     MR. SMITH:  No, I'm not suggesting anything.
12     MR. MULLINS:  I know you weren't.
13     MR. SMITH:  There's something that needs to
14 be cleared up.
15     MR. MULLINS:  Well, that's up to y'all to do
16 it later.
17 BY MR. MULLINS:
18     Q    You and I, let's get back to this question.
19 Was deadly force justified on Joseph McCarthy when he
20 was shot?
21     A    I didn't intentionally shoot Mr. McCarthy.
22 It was a complete accident.  I would not have at that
23 point approached him to try to take his life.  It was
24 not my intentions to fire that gun.
25     Q    All right.  Let's go back to my question.

1 Based on what you knew as you approached the vehicle,
2 was deadly force justified at that time in the
3 shooting on Mr. McCarthy?
4      A    To shoot Mr. McCarthy?
5      Q    Yes.
6      Q    On purpose?
7      Q    Yes, sir.
8      A    No, sir.
9      Q    Okay.  Do you know of any reason why you
10 could not have had another deputy assist you in
11 getting Mr. McCarthy out of the car while one of you
12 held the gun on him?
13     A    Repeat that.
14     Q    Sure.  You had a deputy on that side of the
15 vehicle with you.  Correct?
16     A    Yes.
17     Q    All right.  Any reason why one of you could
18 not have held the gun on Mr. McCarthy while the other
19 reached in without a loaded weapon?
20     MR. SMITH:  Object to the form.
21     A    I think -- I think, you know, when we exit
22 that car and we approached it, my first concern was to
23 get these suspects under our control.
24 BY MR. MULLINS:
25     Q    Absolutely.

1      A    You know, for my protection, for the
2 protection of the three other officers that's there.
3 All of this happened within just a matter of seconds.
4 It wasn't a situation where we could have a group
5 meeting and say -- for me to give the command for Coby
6 to go to the front of the car or Spears to hold the
7 gun on him while I took him out.  You know, that was
8 not an option.  We just -- we reacted to the situation
9 based on how we were trained.  That's what happened.
10     Q    Again, my question:  Is there any reason why
11 you couldn't have put your gun up and had the other
12 deputy hold the gun while you reached in without a
13 loaded weapon to secure Mr. McCarthy?
14     MR. SMITH:  Object to the form.  Asked and
15 answered.
16     MR. MULLINS:  It was asked but never
17 answered.
18     MR. SMITH:  Asked and answered.
19     MR. MULLINS:  Avoided.
20     A    No, I'm not avoiding your question.  I'm
21 answering that that's the way we reacted to our
22 training.
23 BY MR. MULLINS:
24     Q    Well, I know that.
25     A    Any officer has to make a split decision.

We don't have to time to discuss. That's where I
ended and that's where Deputy Spears ended, and
Officer Clay; that's just where we ended when we
approached the vehicle.

Q    So based on your training, you were trained
to reach into a car to seize a suspect with a loaded
weapon? Yes or no?

A    We were trained to get that suspect under
control as soon as possible.

Q    Please answer my question yes or no, and you
can explain, and Roy is going to let you. Were you
trained to subdue a suspect by reaching into a car
with a loaded weapon?

A    I don't think I can actually put a yes or no
to that question. I don't think I can put a yes or no
to that question.

Q    Why is that?

A    Just because, I mean, we were trained on any
felony stop to -- number one, to secure whatever
suspects as soon as possible, and at that time, you
know, I wasn't focusing on what Deputy Spears was
doing. I wasn't focusing completely on what the other
officer was doing. My reaction was to get him under
control, and that's why I reached in.

Q    You say you didn't have time for a group

meeting, but when the car was wrecked and y'all pulled
up, no one was trying to exit the car. Correct?

A    Sir?

Q    No one was trying to exit the vehicle when
you pulled up?

A    The suspect's vehicle?

Q    Yeah.

A    No, sir, not at that time.

Q    You had time to tell the officers, you go to
this side, you go to that side?

A    No, sir.

Q    You didn't have time to say that?

A    No, sir, because, I mean, as soon as I
exited my vehicle, my objective was to get to the
suspect.

Q    Couldn't you have stayed in cover and made
that decision?

MR. SMITH:    Object to the form. That's
speculation. You're asking could you have done this.

MR. MULLINS:    Just object and let him --

MR. SMITH:    Okay. But just some of the --
you're just making up stuff, Monday morning
quarterback. I mean, it's not fair to him.

MR. MULLINS:    It's not fair to ask him
questions?

MR. SMITH:    Could you have done this, could
you have done that, could you have stayed in your car.
I mean --

MR. MULLINS:    You've objected.

MR. SMITH:    I am. But you're not being fair
to him.

MR. MULLINS:    I'm trying to be as fair as I
can.

MR. SMITH:    Well you're not doing a good job
of it.

MR. MULLINS:    He's not answering my
question, so I'm coming back to the same question and
trying to ask it a different way. I just don't know
what else to do.

MR. SMITH:    Well, he's answered the best he
can.

MR. MULLINS:    He's going to answer the best
I want you to answer.

A    I mean, you know...

BY MR. MULLINS:

Q    You're familiar with exigent circumstances,
emergency circumstances?

A    What do you mean?

Q    You're familiar with that term?

A    I'm not for sure --

Q    Emergency situations?

A    Yes, sir. We are in them daily.

Q    Right. And you've got a situation here
where the suspects were contained in the vehicle.
Correct?

MR. SMITH:    Object to the form.

A    They were in the vehicle, yes, sir.

BY MR. MULLINS:

Q    All right. You pulled up along with three
other officers. Correct?

A    Yes.

Q    All trained, all armed?

A    Yes.

Q    You approached the vehicle?

A    Yes.

Q    Did you run to the vehicle or did you slowly
walk to the vehicle?

A    No, sir, I ran.

Q    Okay. So you ran to the vehicle?

A    Yes, or a fast pace, you know.

Q    Okay. And your testimony today -- and I
don't want to misquote you or mislead you, but you
didn't have time to talk to other deputies and make a
plan about what to do. Is that correct?

A    No, sir.

1  Q   Okay.  So when you approached, it didn't
2  occur to you to ask one of the other officers to hold
3  the gun on Mr. McCarthy while you reached in?
4  A   No, sir, I did not ask that.
5  Q   Do you think it's reasonable to reach in in
6  that situation when you have backup with a loaded
7  weapon like you did?
8  MR. SMITH:   Object to the form.
9  A   Yes, sir, I thought that was -- I thought
10  that was the thing for me to do at the time, you know,
11  under all the circumstances was to reach in and get
12  control of him.
13  BY MR. MULLINS:
14  Q   With the loaded weapon in your other hand?
15  A   That's why I put it in the other hand, one
16  handed.
17  Q   Sure.  One --
18  A   I grabbed him with the hand that I had --
19  that was empty.
20  Q   Well, you appreciate the fact that as a
21  police officer that weapons can discharge?
22  A   Yes, sir.
23  Q   Obviously, this one did?
24  A   Yes, sir.  Weapons accidentally discharge
25  every day, yes, sir.

1  Q   Absolutely.  And based on your training with
2  these guns, you know this particular gun has -- and
3  that's what police officers use it for, because it's
4  only got a five and a half pound trigger pull on it.
5  Correct?
6  A   I didn't know what the trigger pull was at
7  the time, but, yes, sir.
8  Q   It shoots easier?
9  A   Yes.
10  Q   As you're reaching in the vehicle, did it
11  not occur to you that the gun may go off?
12  A   No, sir, not at that time, because that's
13  why I had -- that's why I had asked the questions to
14  the other officers, who -- who shot.  Because I guess
15  maybe -- maybe knowing possibly that it was mine but
16  not realizing it, because at that time I didn't think
17  there was any reason for mine to discharge.
18  Q   Do you have any idea how your gun
19  discharged?
20  A   No, sir, I do not.
21  Q   I mean, other than you pulling the trigger?
22  A   I can't say that I pulled the trigger.  I
23  can't say.
24  Q   Okay.  Let's back up.  You don't think you
25  pulled the trigger on that gun?

1  A   I didn't say that either.  I'm saying I
2  don't recall, don't have no idea why my gun
3  discharged.
4  Q   Well, we know there was nothing wrong with
5  your gun after it was test fired.
6  A   I understand that.
7  Q   You're using it today?
8  A   Yes.
9  Q   You've test fired it on the range since
10  then?
11  A   I have shot that gun since then.
12  Q   Has that gun gone off any other way other
13  than you pulling the trigger?
14  A   No, sir, it has not.
15  Q   Would it be fair to say your adrenaline was
16  pumping pretty good that night when you were coming up
17  on the car?
18  A   It was somewhat I'm sure.  It was a
19  stressful situation.
20  Q   Absolutely.  In your affidavit, you
21  mentioned something that I'm going to ask you about,
22  Paragraph 14, Page 3.
23  A   What, now?
24  Q   Paragraph 14, Page 3, that last sentence I'm
25  interested in.

1  A   Yes.
2  Q   Okay.  Can you read that to me out loud for
3  the record?
4  A   All right.  The suspect vehicle was
5  positioned in an area where the soil and gravel was
6  uneven and it was on a slight hillside, all which made
7  standing more difficult.
8  Q   Are you -- when you put that in the
9  affidavit, are you saying that that was one of the
10  reasons why your gun discharged?
11  A   I'm saying that -- you know, I was
12  describing the location of -- I'm not saying that's
13  why the gun discharged, because I can't say why the
14  gun discharged.
15  Q   Are you stating here that you lost your
16  footing or slipped in any way?
17  A   No, sir, I did not say that.
18  Q   All right.  I just wanted to make sure when
19  I saw that.
20  A   Yes.  I'm saying I don't know why the gun
21  discharged.
22  Q   Do you recall Mr. McCarthy in the car with
23  his hands up on his head?
24  A   No, sir.
25  Q   All right.  Did you read his statement to

1 the investigators in this case?
2     A   Do what?
3     Q   Did you read his statement to the
4 investigators in this case?
5     A   His statement?
6     Q   Yes, sir.
7     A   I didn't interview him. I don't know what
8 his statement is. I haven't seen a statement from
9 him.
10     Q   That's what I'm asking. Did you read his
11 statement which he gave to the investigators in this
12 case?
13     A   No, sir.
14     Q   All right.
15     A   Which investigators?
16     Q   The same ones that interviewed you.
17     A   Oh, no, sir. I haven't seen any statement
18 of his.
19     Q   All right. We can go off the record real
20 quick.
21         (Off record at 12:16 p.m.)
22         (On record at 12:16 p.m.)
23 BY MR. MULLINS:
24     Q   Sheriff, would you agree with me that it's
25 easier to apprehend a suspect with two hands rather

1 than one hand?
2     A   Yes, sir.
3     Q   Okay. After you all finished and you
4 searched the whole area, including the car, did you
5 find any weapons?
6     A   Sir, I don't know what was found. I was
7 taken to the hospital myself because of the I guess
8 anxiety of just --
9     Q   Stressful situation, everything else that
10 occurred?
11     A   Not what occurred prior, but what --
12     Q   Sure.
13     A   You know, because I mean, you know, I was
14 mighty upset, just put it that way.
15     Q   But based on what you know about the
16 situation, there were no guns or weapons in the car?
17     A   I have not been told of any.
18     MR. MULLINS:   I believe that's all I have.
19     MR. SMITH:   I have got a couple of follow-up
20 questions that you wouldn't let me talk about a while
21 ago.
22     MR. MULLINS:   See, now you get to.
23     MR. SMITH:   Now I'll ask them.
24             **CROSS EXAMINATION**
25 BY MR. SMITH:

1     Q   Sheriff Waddell, you were asked some
2 questions earlier about deadly force and talking about
3 use of deadly force in the pursuit policy and also use
4 of force policy. Is that correct?
5     A   Correct.
6     Q   When you were being asked questions about
7 whether it was reasonable to -- whether use of deadly
8 force was justified in this situation, what
9 understanding did you have about what you were being
10 asked about?
11     MR. MULLINS:   I'm going object to the form
12 and caution the sheriff to be very careful.
13     THE WITNESS:   Do what?
14     MR. MULLINS:   Since you have already given
15 sworn testimony.
16     MR. SMITH:   Yeah. And we are clearing up
17 his misunderstanding.
18     MR. MULLINS:   I'm going to tell you what I'm
19 going to do. I'm going to ask if he has been talked
20 to between the deposition about this, too.
21     MR. SMITH:   And he has. That's what I was
22 trying to tell you. He asked --
23 BY MR. SMITH:
24     Q   Sheriff, when we took a break, did you ask a
25 question --

1     A   Yes, sir.
2     Q   -- concerning deadly force?
3     A   Yes, sir.
4     Q   What did you ask?
5     A   I asked him was -- well, first I told you I
6 didn't really understand that, that I thought he was
7 asking me did I feel like I would be justified to
8 shoot the suspect at the time that the pursuit was in
9 progress.
10     Q   Okay.
11     MR. SMITH:   Well, that's what I was trying
12 to bring up earlier during your portion so you could
13 question him about it, because he had a
14 misunderstanding about it.
15 BY MR. SMITH:
16     Q   Let me go back to looking at the pursuit
17 policy. Do you have that?
18     MR. SMITH:   What exhibit is that, Chuck?
19     MR. MULLINS:   6.
20 BY MR. SMITH:
21     Q   You were asked about pursuit tactics on Page
22 3 or 4.
23     A   Yes.
24     Q   Paragraph 4 was specifically the section you
25 were asked about. Would you read that into the

1   record?

2      A    Ramming, bumping or any other intentional

3   contact between vehicles is not authorized, except by

4   a supervisor, and only if deadly force is otherwise

5   justified by the department's use of force policy.

6      Q    All right. Now let me -- is the use of

7   force policy an exhibit?

8           MR. MULLINS:  6.

9   BY MR. SMITH:

10      Q    Would you look at Exhibit 6?

11           MR. MULLINS:  Same one. Just flip back a

12   few. They are your policies. I'm sure your familiar

13   with them.

14   BY MR. SMITH:

15      Q    On Page 4 of 8 -- it's 4 of 8 under the

16   topic Application --

17      A    Application of Use of Force and Deadly

18   Force.

19      Q    Deadly force. What is does it -- read the

20   first part of that, the title and then the sentence

21   after that, and then go down and read Number 2.

22      A    Talking about Application of Use of Force

23   and Deadly Force? Sentence one: To defend himself,

24   or others against serious threats or --

25      Q    Hold on. I'm trying to get you to not read

1   the whole paragraph, but just read the part under

2   Application of Deadly Force. Read that sentence and

3   then skip down to Number 2 and tell us what that says.

4      A    Okay. Application of deadly force and force

5   are authorized by a peace officer only to achieve the

6   following lawful objectives.

7         And sentence Number 2, you say?

8      Q    Yes.

9      A    To stop dangerous felony flight where there

10   is a serious risk to the public of death or serious

11   bodily injury.

12      Q    Based on the policy regarding application

13   and use of deadly force, were -- what circumstances,

14   if any, were present in this case as stated in Number

15   2?

16      A    Okay. It would be to stop the flight, to

17   stop any risk of serious injuries to any of the

18   motorists on the highway, and also for the officer

19   that was, you know, that was rammed.

20      Q    Okay. Looking at the pursuit policy, that

21   Paragraph 4 that you have been previously asked about

22   about bumping and ramming, deadly force is only

23   justified by the department's use of force policy.

24   You can do that only if it's justified by the

25   department's use of force policy. Is that correct?

1      A    That's correct.

2      Q    Okay. Under the use of force policy of the

3   sheriff's department, was the use of deadly force

4   justified in a situation which y'all were faced with

5   in this pursuit?

6      A    Yes, sir, on the -- the dangers of the other

7   motorists. My intention was to stop the pursuit from

8   going any further.

9      Q    All right. And when asked that previously

10   about the pursuit policy in Paragraph 4 and the

11   pursuit policy on Page 3 and 4, when you were asked if

12   deadly force was used and if deadly force was

13   justified, what were you -- what was your

14   understanding of what he was asking you?

15      A    Well, what I asked you in there, my

16   understanding was that he was asking me did I think I

17   had the authority to -- to shoot or take the life of

18   either of the one suspects.

19      Q    Okay.

20      A    Which I don't -- you know, that's the way I

21   understood it.

22           MR. SMITH:  That's all I have.

23           **REDIRECT EXAMINATION**

24   BY MR. MULLINS:

25      Q    All right. Since we have brought this up,

1   tell me what happened when you took a break and we

2   went --

3      A    A few minutes ago?

4      Q    Yeah.

5      A    First thing I did, I went to the restroom.

6   Then I came back and I asked my attorneys -- well, I

7   brought it to them that I did not feel like that I

8   understood, was he asking me did I think I had reasons

9   enough. Use of deadly force to me is meaning that,

10   you know, I have -- I have the reason to actually --

11   to shoot you.

12      Q    And, you know, you and I were talking about

13   Exhibit 6 under the pursuit policy, specifically

14   ramming and bumping and other intentional contact

15   between vehicles.

16      A    Yes, sir.

17      Q    Regarding -- and we were looking at this

18   very -- I never said anything about shooting.

19   Correct?

20      A    No, but you asked me did I feel that I had

21   reason to use deadly force which means, in my mind,

22   you are asking me did I feel like I would be justified

23   during the pursuit to, you know, to shoot at or shoot

24   at the vehicle of the fleeing suspect.

25      Q    But we were looking at ramming and bumping

1  and intentional conduct.
2      A    But the word "using deadly force" was what I
3  was focusing on of thinking that you were asking me
4  did I feel like I would be justified if -- if I shot
5  my weapon at those two individuals while pursuing.
6      Q    Well, you know that your policy, your
7  policies and procedures, treat deadly force, be it
8  ramming or bumping or shooting, as the same?
9      A    I felt like I was justified in stopping the
10 pursuit.
11     Q    You're not answering my question.
12          MR. SMITH:  You're not letting him answer.
13 BY MR. MULLINS:
14     Q    Did you realize that deadly force is being
15 treated in this case, in your own policies and
16 procedures, deadly force is being treated as shooting
17 someone or intentionally running them off the road?
18 Yes or no?
19     A    There's a difference.
20     Q    No, sir.  I beg to differ.
21          Your policies treat deadly force, be it
22 running somebody off the road or shooting them, as the
23 same thing.
24          MR. SMITH:  Where does it say that in the
25 policy?  Object to the form.

1  understand what you were getting at.  I thought you
2  were asking me did I have reason to pull alongside
3  that vehicle and shoot the driver.
4      Q    Did you even read the use of force policy
5  before going out on this pursuit, the one that
6  Mr. Smith just asked you about?
7      A    Before that night?
8      Q    Yes, sir.
9      A    I've read through the policies on and off.
10     Q    Did you read the use of force policy?
11     A    I don't recall.
12     Q    So when you say that you were talking about
13 use of deadly force and whether it was justified or
14 not, you can't sit here and tell me whether you read
15 the policies and procedures that night before you
16 authorized deadly force to be used.  Correct?
17     A    I don't recall.  Yes, sir, that's what I'm
18 saying.
19     Q    And you can't even tell me right now whether
20 you knew all the facts that your deputies knew who
21 were already involved in a pursuit that night,
22 correct, prior to making this decision to put these
23 boys in the road?
24     A    Do what, now?
25     Q    You didn't know all the facts that your

1      A    I feel like it was my duty at that moment to
2  stop the vehicle, but I was not going to stop that
3  vehicle by shooting the driver or anybody else.
4  BY MR. MULLINS:
5      Q    Do you consider ramming or bumping that
6  vehicle to be deadly force under your policies and
7  procedures?
8      A    If a vehicle is forced off the road, there
9  is a chance of injuries.  I'm answering your questions
10 the best I know, the best way I know.
11     Q    Is it deadly force or not, under your own
12 policies and procedures?
13          MR. SMITH:  Object to the form.
14     A    Yes.
15 BY MR. MULLINS:
16     Q    Okay.  Did you think when you ordered that
17 car to be ran off the road that deadly force was
18 justified?
19     A    Yes, I feel like they was already -- with
20 him ramming the patrol car -- actually, he had already
21 used deadly force against the officer.
22     Q    So even though we asked the same question,
23 after you met with your lawyers, now your testimony
24 has changed.  Is that correct?
25     A    No.  I asked the question because I didn't

1  deputies knew that night?
2          MR. SMITH:  Object to the form.
3      A    The facts I had and the facts I knew is of
4  the call, the 911 call where the homeowner reported
5  that the vehicle was taken.  I knew the facts of the
6  reckless driving.  I knew the facts of the patrol car
7  being -- being rammed from the rear, and I had the
8  fact of he was driving without any headlights and a
9  blown right tire.  That's the facts that I had.
10         MR. MULLINS:  I think that's all I have.
11         MR. SMITH:  Nothing else.
12         (Deposition concluded at 12:30 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF REPORTER

I, CARRIE L. BENOIST, in and for the State
of Mississippi, do hereby certify that the above and
foregoing pages contain a full, true and correct
transcript of the deposition of TOMMY WADDELL taken in
the aforenamed case at the time and place indicated,
to the best of my skill and ability.

We also certify that the witness was placed
under oath to tell the truth and that all answers
were given under that oath.

We also certify that we have no interest,
monetary or otherwise, in the outcome of this case.

This the 26th day of November, 2013.

—————————————

CARRIE L. BENOIST, CCR #1744